# Albright, Appellant, v. Byers-Allen Lumber Company.

*Tax sale—Unseated land—Assessments in names of two parties.*

While unseated land is itself the debtor for a school tax legally assessed thereon, yet it is but once liable therefor. If there are two claimants of the same land, and it is assessed in the same year in the name of each, and one of them pays the tax, it cannot be afterwards sold, so as to convey any title, for the nonpayment of the tax assessed against it in the name of the other claimant. Having once responded to the public demand upon it, it cannot be made to do so again for the same demand.

If the legal owner of the land be in no default with respect to the taxes assessed on his land, and has done all that was necessary to discharge them from this land, by either payment or other legal means, it cannot be afterwards sold for the tax from which it was legally discharged, simply because the tax for which it was sold had been imposed thereon in the name of another claimant and remained unpaid by that claimant.

Argued Oct. 14, 1902. Appeal, No. 134, Oct. T., 1902, by plaintiff, from judgment of C. P. Westmoreland Co., Nov. T., 1899, No. 377, for defendant on trial by court without a jury in case of John C. Albright et al. v. Byers-Allen Lumber Company. Before McCollum, C. J., Mitchell, Dean, Fell, Brown, Mestrezat and Potter, JJ. Affirmed.

Ejectment for lands situated in Cook township.
The case was tried by McConnell, J., without a jury.

The court filed the following opinion:
From the evidence in the case, the court deduces the following findings of fact:

### A. PLAINTIFFS' TITLE.

1. On February 26, 1855, Henry Marteeny and John Neiderheiser filed with the surveyor general an application for 400 acres of land situate on Laurel Hill, in Cook township, in the county of Westmoreland, adjoining Alexander Caven, on the northwest, and Daniel Dearborn on the south, which land was described in the application as being unimproved. On the same day the warrant of the surveyor general issued to Joseph Greer, surveyor of Westmoreland county, for the survey thereof. On January 25, 1870, W. R. Barnhart, county surveyor, in pursu-

ance of the aforesaid warrant, made a survey of the tract described in the writ, which was received and accepted on June 15, 1870. On June 16, 1870, a patent was issued for said tract to William Hays, guardian of the minor children of Jacob Hays, deceased, and in trust for them according to their respective interests, it being recited therein that it was issued in consideration of the money theretofore paid by Henry Marteeny and John Neiderheiser, and that the interest of said warrantees had become vested in the said William Hays, guardian.

Prior to the date of the aforesaid patent, to wit: on June 13, 1857, Henry Martneey had conveyed the undivided one half of said tract to Jacob L. Hays, and, on March 27, 1860, John Neiderheiser and wife had conveyed, to the same grantee, the other undivided one half.

In the years 1856, 1857 and 1858, inclusive, John Neiderheiser was assessed in Cook township with 400 acres of mountain land. In the years 1859 and 1860, it was assessed to " Neiderheiser & Hays." In 1861, a transfer to Jacob Hays was noted on the assessment books. From 1862 to 1870, inclusive, it was assessed in the name of " Jacob Hays." From that time down to and including 1882, it continued to be assessed in the name of " Jacob Hays' heirs."

On June 12, 1876, James Gregg, treasurer of Westmoreland county, executed a deed to Jacob Gettemy for 400 acres of land in Cook township, which recited that said land had been assessed in the name of " Jacob Hays' heirs " for the year 1874 with the sum of $1.60 school tax, and $3.20 bounty tax, which had remained unpaid for the space of one year and more, and that he had accordingly, that day, sold the land at public sale, to secure payment of the said taxes and the costs necessarily accrued thereon (the whole amounting to $8.80), and that this had been done in pursuance of the several acts of assembly of the commonwealth in such case made and provided.

This deed was acknowledged in open court on September 2, 1876, and shortly thereafter delivered to the purchaser, he having complied with the statutory terms of purchase at such sales.

The returns of unseated lands in Cook township, for the year 1874, show that " Jac. Hays's heirs " were assessed with 400 acres of land, valued at $400.

By a local act, passed March 31, 1856, P. L. 416, the school

board of Cook township was authorized to levy a tax for discharging a debt of the district for bounties.

At a meeting of that board, on June 6, 1874, all the members thereof were present, and it was unanimously agreed to that " a tax of eight mills on each dollar of valuation be levied to pay an old debt contracted by a former board borrowing money and failing to levy a sufficient amount to pay the whole of such claim with interest, leaving a balance of about $1,500 against Cook school district." It was also agreed to unanimously, at the same meeting, that " the rate for school purposes be four mills on dollar." Wm. Hood was elected collector and treasurer of school tax, at a compensation of four and three fourths per cent, and also collector and treasurer of the tax for liquidating the old debt, for which he was to receive a compensation of five per cent.

At a meeting of the school board, held April 3, 1875, Wm. Hood, collector, presented his claims for exonerations. Among those then presented (and allowed by the board at a subsequent meeting, on May 29, 1875), we find " Unseated land returned for school tax, 1874."

| | |
|---|---|
| Hays, Jacob, Heirs............................ | $1.60 |
| Unseated land returned for bounty tax, levied in 1874, Hays, Jacob, Heirs..................... | 3.20 |

No return of these taxes being unpaid, made by Wm. Hood, collector, has been found to be now on file in the commissioners' office. William Hood, however, testifies that the taxes were in fact not paid to him, and that he made a return to that effect.

In a book kept in the treasurer's office, and called " Sales Book No. 4," we find the following :

" To the commissioners of Westmoreland county :

" I, George Campbell, collector of state and county taxes for the year A. D. 1874, do certify that the owners or possessors of the following described real estate have refused or neglected to pay the taxes assessed thereon, and that I could not find personal property on the premises sufficient to pay said taxes ; therefor, I return the same to the commissioners, to be sold by them for said taxes, and claim an exoneration for the same, viz."

Below this caption is a statement of unpaid taxes, including county, road and school, owing by a number of persons in Cook township.    Among this number is the following : " Jac. Hays's heirs—$400 ; school tax, $1.60—$3.20."

The caption above recited is not signed by any one, is not in the handwriting of Geo. Campbell, and is not the original of any return made by him.    It is entered in a book with other similar entries relating to other townships, which entries also, in many instances, group school and road taxes (which the collector of state and county tax then had no power to collect and no right to be exonerated of), with unpaid county taxes (which he had power to collect and the right to be exonerated of).

The book is kept in the handwriting of a clerk, either in the commissioners' office or in the treasurer's office.

In the treasurer's sale book 5, page 3, we have the following entry :

Hays, Jacob, Heirs.....1874......400 acres.......$400
School.............................. $1.60
Bounty............................  3.20
Treasurer..........................  4.00
                                    ─────
                                    $8.80

" June 12, 1876, sold to Jac. Gettemy for $23.00.
" Rec'd tax, $8.80," etc.

After this treasurer's sale, until and including the year 1882, the land continued to be assessed in the name of " Jac. Hays's heirs," but the taxes were paid by Jacob Gettemy.   From 1883 to 1894 it was assessed in the name of " Jacob Gettemy."   From 1895 to 1899 it was assessed in the name of " Jacob Gettemy's heirs."

Jacob Gettemy having died intestate, his administrator procured an order of sale for the payment of debts, of the lands described in the writ, and by virtue of proceedings in the orphans' court the administrator conveyed them to Noah J. Horner, who subsequently, to wit: on August 14, 1896, conveyed them, for the consideration therein mentioned, to three of the present plaintiffs and another, which other grantee subsequently conveyed his interest therein to the fourth person named as plaintiff in this case.

During the time Marteeny and Neiderheiser claimed to be the owners of these lands, they prospected thereon for silver, but, being unsuccessful, this work was abandoned. Neither they, nor any of their alleged successors in title, ever cultivated any part of the land or resided on it, or inclosed any part of it. Their claims seem to have been known of in the neighborhood, but the limits and precise location of their claims were not generally understood, and the same witnesses who testify to these facts seem to also have known of the existence, at the same time, of these claims which are now the property of the defendant, and the exercise of numerous acts of ownership under such claims.

The location of the Marteeny and Neiderheiser survey was well marked on the ground, and is not a matter of dispute in this case.

2. The defendant, at the time of the issue and service of the writ in this case, was in possession of the land therein described and claims to be the legal owner thereof, and to have the right to such possession by reason of such ownership.

### B. DEFENDANT'S TITLE.

3. The defendant claims title to the lands in dispute from warrants and surveys to John Campbell, Alexander Johnston, John Campbell, Sr., and Joseph Campbell. Patents based on the claims of these warrantees have been issued by the commonwealth, and, by regular chains of title, the rights of the warrantees have become vested in the defendant, in so far as those rights conflict with the rights set up by the plaintiffs. The facts in regard to the locating of these warrants and surveys upon the ground are as follows :

No monuments of the surveys made under these four warrants have been found upon the ground. They are four out of a large series of warrants, all bearing date September 7, 1793. Northwest of this batch of surveys is located a survey of a tract belonging to Andrew Lynn. This was surveyed March 20. 1788, pursuant to two warrants in favor of Andrew Lynn, one bearing date February 25, 1786, and the other November 16, 1787. The lines of this survey are well marked upon the ground. The survey on the warrant of Robert Campbell, Sr. (one of the warrants of September 7, 1793), calls for

this Andrew Lynn tract as an adjoiner, and gives as boundaries of the Campbell tract five lines that are identical with the known and marked lines of the Andrew Lynn tract. The relative position of the surveys made under the warrants of September 7, 1793, is shown by the calls for adjoiners, and the projected dotted lines in the original surveys. With the Robert Campbell, Sr., survey located, it is possible to connect all these separate surveys, and to lay them down upon the ground, assigning to each its proper relative position. Some of this batch of surveys call for the Bedford county line as a boundary. Westmoreland county had been taken from Bedford county but a short time before these surveys were made, to wit: February 26, 1773. See P. L. 402. The location of this line is well known. The surveys of Ruth Campbell and Robert Campbell, Jr., call for this line as a boundary. They are two of the batch for which warrants were issued on September 7, 1793. With the survey of Robert Campbell, Sr., definitely located by the Andrew Lynn lines, and the other surveys of that batch connected therewith and to each other according to their calls and their projected lines, it brings the Ruth Campbell and the Robert Campbell, Jr., surveys to their proper place on the Bedford county line, two points that can be located with certainty.

The surveys were all made by the same deputy surveyor (according to the original drafts), and were made on May 12, 13, 14, 15 and 16, 1794. The surveys are regular in form, except where the course of the Bedford county line, or the irregular course of Andrew Lynn line interfere with this irregularity of outline. They are generally 260 perches long by 260 perches wide, with boundary lines running directly east and west and north and south.

As already stated, there are no monuments made on the ground by the surveyor, but the lines of the Andrew Lynn survey and the Bedford county line (both adopted by him), are distinctly marked. Locating the four surveys, under which defendant has title, by means of these fixed points, and by aid of the courses, distances and calls in series of surveys made pursuant to the warrants of September, 1793, it throws them down on the ground embraced in the Marteeny and Neiderheiser warrant. The Marteeny and Neiderheiser warrant would thus lie mainly over the Alexander Johnston tract, but overlapping

it into the John Campbell, Joseph Campbell and John Campbell, Sr., as shown by the draft.

There is no room for the Marteeny and Neiderheiser warrant any place between the Andrew Lynn tract and the Bedford county line, except over some part of the land warranted on September 7, 1793, to other warrantees. In addition to the warrants and surveys above referred to, Wm. Blaine took out a warrant, on July 13, 1831, for twenty acres and allowance. This was surveyed May 4, 1841. It encroaches on the Robert Campbell, Sr., tract, the John Campbell tract, and the Alexander Johnston, as shown in the annexed draft. He also took out a warrant on February 11, 1847, for fifty-two acres, which encroached on the John Campbell, Alexander Johnston and Joseph Campbell, as shown by the draft.

These titles of Blaine have also become vested in the defendant.

In the deed of Alexander Caven's administrator to Robert M. Graham and N. M. Marker, dated May 23, 1863, the Alexander Johnston tract is conveyed, and the defendant traces title through it. The description of the land calls for Henry Marteeny and John Neiderheiser as an adjoiner. A portion of the land claimed by them would, in fact, adjoin the Johnston land on the west.

Robert M. Graham and N. M. Marker on March 15, 1872, conveyed to Wm. E. Robbins a tract of land supposed to originally contain 700 or 800 acres, including the Alexander Johnston tract and excluding from their purchase of May 23, 1863, a portion of the Campbell tract and a portion of the Blaine tract, containing 143 acres and 138 perches, which they had previously conveyed to John Enos. During the time of Robbins's ownership, the Hays heirs had a survey made of the Marteeny and Neiderheiser tract. Wm. Robbins pointed out to the surveyor a starting point, where he had been told the Marteeny and Neiderheiser line was marked. At the time of doing so he did not know that it overlay the Alexander Johnston tract, which he then claimed. He in no way agreed or admitted that the Marteeny and Neiderheiser tract had a definite location, either within or without the lines of his own tract, being himself at the time uninformed on that subject. Notwithstanding the two facts last alluded to, we conclude that the location given

the Campbell and Johnston warrants, with respect to the Marteeny and Neiderheiser tract, is correctly exhibited on the map.

R. M. Graham and N. M. Marker, on May 23, 1863, acquired title to this tract of land in Cook township, described in the deed as containing 570 acres more or less, and embracing the Alexander Johnston tract of 398 acres and 90 perches, and others. On March 16, 1872, for the consideration of $3,000, they conveyed it—less the John Enos purchase—to William E. Robbins. During the period of their ownership it was assessed annually, and they paid the taxes on it. There was embraced in this tract the Wm. Blaine tract of twenty acres which lay principally outside of the Alexander Johnston tract. On it was a sawmill and tenant house, occupied by lessees of Graham and Marker. During their period of ownership, they cut timber all over the tract, including the land now claimed by the plaintiffs. They manufactured some of this timber into barrel staves, and hauled some of it to the Wm. Blaine sawmill, and manufactured it into lumber and sold the product. Every year they either cut timber or peeled bark on it and sometimes did both. During this period, one Wolfersberger, commenced to make staves on this tract. Marker and Graham showed him their title to the tract, paid him for the materials he had there, and he left. No other interference with their right of dominion over the tract was experienced.

On March 16, 1872, for a consideration of $3,000, they sold the tract involved in this interference (that being all the tract which they had acquired in 1863, except what they had previously conveyed to John Enos), to Wm. E. Robbins. Afterwards, to wit : on December 5, 1874, Wm. E. Robbins and wife reconveyed the undivided one half thereof to the aforesaid N. M. Marker, and, on April 12, 1876, he conveyed to the same grantee the other undivided one half thereof.

In 1872, 1873, 1874, 1875 and 1876, " Wm. Robbins, nonresident," was regularly assessed for land in Cook township. In 1872 and 1873 the amount of land was designated as 650 acres, and in the other years as 500. In these last mentioned years, the tract is further identified by mentioning a sawmill as a part of the assessed property, and for the year 1874, names " Geo. Kuhns, tenant," as the occupier of the land. He was the tenant of the house located on the twenty acre Blaine tract

at this time. The county tax assessed against Wm. Robbins on the tract for 1874 was $1.95.

Among the exonerations allowed by the school board of Cook township to Wm. Hood, collector of school and bounty taxes for 1874, we find him exonerated of $2.00 school tax assessed against Wm. Robbins, and $5.20 for old debt or bounty tax. The reason given for the last mentioned exoneration in the minute book of the school board is the fact that Wm. Robbins was a "soldier" and not liable for such tax. The reason for exonerating the tax collector from the collection of the school tax is not set out in the minute book, but Wm. Robbins testifies that this exoneration was allowed for the reason that the property was two miles distant from any school. Whatever the reason may have been, it clearly enough appears from the minute book of the school board that, on April 3, 1875, Wm. Hood, collector, was exonerated from the collection of this tax.

In this connection it will be recalled that plaintiffs trace title through a tax sale of the Marteeny and Neiderheiser tract for school and bounty tax assessed for 1874 in the name of " Hays, Jac., heirs," and that the assessment of school and bounty tax in the name of Wm. Robbins for that year, is an assessment of the same lands to the extent of the interference of the two titles, as above stated.

In 1875, Wm. Robbins and N. M. Marker built another sawmill. They operated both sawmills and supplied the timber from the entire tract. They also peeled bark all over it. After Robbins conveyed all his title back to Marker he continued these operations in behalf of the latter. Since the acquisition of the title by N. M. Marker, and down until the time of his death, he continued to pay taxes annually assessed in his name on the land, and to exercise dominion over it by selling timber from it, and entering into written agreements with respect to it, with a number of different people. He had no other lands in Cook. township to which these transactions could relate. During his lifetime he had signed an option for the sale of this tract, but no sale was ever consummated until the one made by his devisees since his death.

### CONCLUSIONS OF LAW.

From the foregoing facts we deduce the following conclusions of law, viz :

## I.

1. If, on February 26, 1855, the date of the warrant for a survey to Marteeny and Neiderheiser, there was no title in the commonwealth, none could pass out of it to them through that warrant followed later by a survey, or through the patent subsequently issued to the Jacob Hays heirs.

2. If the warrants issued September 7, 1793, and the surveys thereunder, made, returned and accepted in May, 1794, embrace the same land as the Marteeny and Neiderheiser warrant and survey, they had operated on it so as to completely divest the commonwealth's title, before the later title had its inception.

3. The law requires the deputy surveyor, in executing a warrant of survey, to actually go upon and measure the land to which it relates, and to mark the same upon the ground. If the deputy contents himself, in the performance of his duty, with merely plotting a supposed survey in his chamber and making a return thereof, it is a breach of the law, and such a return and the acceptance thereof raise only a prima facie presumption of performance of duty which may be overthrown by proof of the facts, and, in such a case, no title will pass, but the land will be left open to another applicant, who may legally take it up and obtain a good title therefor, through a later warrant and survey, made according to law.

4. This prima facie presumption of performance of legal duty is, however, only rebuttable by adverse proof for a period of twenty-one years, and, after that time, it becomes a presumption of the law and by the law that the survey was properly made on the ground, and no fact, however obvious it may be in the evidence, can overthrow the legal effect of this presumption.

5. This presumption, however, only relates to the performance of the surveyor's duty, and will not of itself locate the subject-matter of the survey. To do this some monument of survey must be found on the ground.

6. Where several warrants are taken at the same time (as was done in this case, in 1793), one of which calls for known boundaries, and the next for that warrant, and so on, through the series, the location of the whole block may be fixed with certainty and the appropriate place assigned to each warrant in the survey of the block. By means of the Andrew Lynn lines and county line, both well known boundaries of the block of

surveys to which the Alexander Johnston, the John Campbell, the Joseph Campbell and the John Campbell, Sr., belong, the location of these last mentioned surveys can be fixed on the ground with certainty by simply following the calls, courses and distances and having respect to the projected lines shown in the surveys as they are returned and accepted.

7. They can also be located with certainty, if they are considered as independent surveys, by following the calls, courses and distances given in them respectively, and, at the same time, having regard to the dates of the surveys and to the legal effect which the earlier survey has in locating its adjoiner surveyed on a later day and calling for it as an adjoiner.

8. Locating the four returned and accepted surveys of 1794, which are involved in this interference through the means mentioned in the sixth and seventh paragraphs, and supplementing the legal effect of such location by the presumption mentioned in the third and fourth paragraphs, we conclude that the defendant is possessed of the only title which the commonwealth had to give by warrant and survey, and that, therefore, the conditional conclusions in the first and second paragraphs become absolute and unconditional. The plaintiffs have not shown that any title passed through the Marteeny and Neiderheiser warrant and survey.

## II.

9. When unseated land is sold for nonpayment of taxes, the title of the real owner passes to the purchaser, whether it be assessed and sold in his name, the name of a warrantee or of a stranger, and whether the person in whose name it is taxed and sold has or has not any title.

10. If the Marteeny and Neiderheiser tract was assessed with a school tax, to which it was legally liable, and the county treasurer through the prescribed legal procedure made sale of it for the collection of said tax, the good title of the defendant, or those under whom it claims, would pass to the purchaser at such sale, even though the persons whose names were connected with the title to the tract by the terms of the assessment and sale had no title at all to it.

11. The act of 1815 provides " that no alleged irregularity in the assessment, or in the process, or otherwise, shall be con-

strued or taken to affect the title of the purchaser, but the same shall be declared to be good and legal." The jurisdiction of the treasurer to make sale of unseated lands, since the passage of this act, depends upon the facts that the tax has been assessed regularly or irregularly, upon the land by the proper officers, and has been due for one whole year and remains unpaid. If these facts appear the demand for regularity of procedure is satisfied, since the act of 1815.

12. The source from which these essential facts are to be ascertained is the records in the commissioners' office. The act of assembly assumes the ascertainment of these facts by the treasurer and addresses its mandate to him directly to "make public sale of the whole or any part of such unseated lands, situate in the proper county as will pay the arrearages of the taxes, any part of which shall then have remained due and unpaid for the space of one year." It does not require any warrant from the commissioners to prompt him to action. There is no express provision in the law requiring that the commissioners shall in any prescribed mode certify to the treasurer what taxes on unseated lands are unpaid, for the treasurer is himself the proper collector of such taxes under the law.

13. The fact that on the treasurer's sale book there is found written over an enumeration of unpaid county, school and road taxes for Cook township, what in form purports to be a statement of the collector of county and state taxes with respect to such taxes on seated lands, made for the purpose of obtaining from the commissioners an exoneration from the collection thereof, for the reasons therein set out, will not be construed to be a statement with respect to school taxes on unseated lands, which such a collector was not charged with the collection of, and could not be legally exonerated of, and it will not be considered as having any connection with the legal procedure whereby the treasurer made sale of the land for the collection of the school taxes. If the mode of making an entry on the treasurer's books of unpaid school taxes on such lands was irregular, by reason of its associating such taxes with a statement to the commissioners concerning other taxes made by the collector thereof, but which statement, even when confined to its proper subject-matter, had no legal demand for its presence on the treasurer's books, such irregularity of procedure is cured by the act of 1815.

14. It will be assumed, in favor of a title coming through such a sale, that the treasurer obtained his information with respect to the school taxes on unseated lands, of which taxes he alone is given power to compel collection, from the proper source viz : from the commissioners' office.   It will be assumed, too, that a proper return to that office was made by the collector of school taxes for Cook township, when he testifies that he made a return, and the amount of tax for which the land was sold corresponds with the amount that the collector was exonerated of (according to the records of the school board), because it was charged on unseated lands assessed to Jacob Hays's heirs.   The fact that this return cannot now be found in the commissioners' office will not destroy the force of these presumptions and thereby invalidate the title coming through the sale.

15. If the land was liable to the tax assessed against it, in 1874, in the name of Jacob Hays's heirs, the procedure whereby it was sold is sufficiently regular to carry the title of the real owner of the land to the purchaser.

16. While unseated land is itself the debtor for the school tax legally assessed thereon, yet it is but once liable therefor.   If there are two claimants of the same land, and it is assessed in the same year in the name of each, and one of them pays the tax, it cannot be afterwards sold, so as to convey any title, for the nonpayment of the tax assessed against it in the name of the other claimant.   Having once responded to the public demand upon it, it cannot be made to do so again for the same demand.

17. If the legal owner of the land be in no default with respect to the taxes assessed on his land, and has done all that was necessary to discharge them from his land, by either payment or other legal means, it cannot be afterwards sold for the tax from which it was legally discharged, simply because the tax for which it was sold had been imposed thereon in the name of another claimant and remained unpaid by that claimant.

18. The land embraced in this interference having been assessed in 1874 as seated land belonging to Wm. Robbins, and having had imposed on it in that name a school tax which the collector of such taxes was authorized by the school board to collect, but from the collection of which he obtained exoneration from the same school board, said school board being the sole agency designated by the law to determine the right to exonera-

tion for taxes of that kind, it cannot be sold by the treasurer afterwards for the nonpayment of the tax of which it had been previously exonerated, simply because the same charge appeared again in the assessment books in the name of Jacob Hays's heirs. The land having once responded, in a legal way, to the public demand upon it, when it was assessed in the name of the real owner, cannot be made to do so again, simply because of a second charge for the same tax imposed on it in the name of claimants who had no title to it. The response to the public demand having first been made by the real owner, both charges were divested and the subsequent sale conveyed no title.

### III.

19. The land claimed by the plaintiffs being uncultivated and unimproved woodland, and the plaintiffs never having had actual, visible, notorious, hostile, adverse, exclusive, continued, peaceable, distinct, definite and positive possession thereof, for a period of twenty-one years, they can have no valid title under the statute of limitations.

### IV.

20. The plaintiffs must recover, if at all, on the strength of their own title. Having shown no title they are not entitled to recover at all.

*Error assigned* was the judgment of the court.

*Vin E. Williams*, with him *H. H. Fisher*, for appellant.

*James S. Moorhead*, with him *W. H. Ruppel, H. E. Marker, C. B. Hollingsworth* and *John B. Head*, for appellee.

PER CURIAM, November 3, 1902:

By agreement of the parties this case was tried by the court without a jury. To the findings of fact we give the same effect that we should to a verdict. The findings of law are fully sustained by the opinion filed, and on it we affirm the judgment.